IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PANO STEPHENS,<br><br>    Plaintiff,<br><br>v.<br><br>ALLIED INSURANCE COMPANY,<br><br>    Defendant. | No. C 06-01019 CRB<br><br>**MEMORANDUM AND ORDER** |

    Plaintiff Pano Stephens ("Plaintiff") owns an office building. An especially rainy season in December 2002 caused the building to sustain significant water damage from a leaky roof. As a result, Plaintiff filed a claim with his insurance company, Allied Insurance Company ("AMCO"). After an investigation, AMCO denied the claim stating that the cause of the leaky roof was not covered under Plaintiff's insurance policy. Plaintiff filed suit. Now before the Court is AMCO's motion for summary judgment. For the reasons explained below, AMCO's motion is GRANTED.

### BACKGROUND

    Plaintiff is an attorney in Ukiah, California. He owns a three-story office building in that city where he has his law practice on the first floor and rents office space in the building to other tenants. In 1994 he had new heating and air-conditioning ("HVAC") units installed

on the roof of the building. The installation was performed by AC&R Services ("AC&R"). That winter, and apparently every winter up through 2001-02, Plaintiff noticed several leaks, primarily in the bathroom and hallways. Plaintiff, along with his office manager, Sheila Holland, addressed the leak problems by using buckets to collect the rainwater and towels to wipe up the water. Plaintiff hired roofers in an attempt to locate and fix the leak, but the source of the leak was never found.

The winter of 2002-03 was especially stormy, with the City of Ukiah receiving more than half of its average annual rainfall in the month of December. Plaintiff recalled two storms that month: one "somewhere in the middle of the month and then again at the end of the month." Gamboa Decl. ¶ 6, Ex. D (pp.62-63). And just as in past winters, with the rain came the leaks.

On December 13, 2002, Plaintiff contacted a roofing company to conduct "emergency roof repairs." Id. at 39-40. Plaintiff described the water incursion he observed in December as "pouring into the building," and that water was "coming down the walls."[1] Id. at 40. On December 28, 2002, Plaintiff called Ms. Holland and told her, "[w]e have a real problem. Can you bring towels?" Id. at ¶ 5, Ex. C (p.6). Ms. Holland described the water incursion she observed as "sheeting down [the] wall" and "the carpets squished when you walked on it." Id. at 7. According to Plaintiff, water was also coming "from the ceiling tiles," and "we had buckets in the hallway trying to collect it and we had towels and stuff spread." Id. at ¶ 6, Ex. D (p.40). "It was coming in the closet, huge amounts, and then in the bathroom as well." Id. Plaintiff acknowledged that he observed all of this "around the end of the year, the 28th [of December], that period of time." Id. at 43. When later asked how far the water damage was spread at that time, Plaintiff replied "everything was wet up here. Carpets were wet. . . . It got under the linoleum." Id. at 41. Plaintiff described the ceiling tiles as "saturated," "sagging," and "dripping." Id. at 43.

---

[1] Plaintiff described the phenomenon as "kind of like one of those environmental water things that you buy where water runs down in a sheet." Gamboa Decl. ¶ 6, Ex. D (pp.42-43).

2

Around that time Plaintiff placed a call to his contractor, Gary Schinsing,[2] who stated that he was contacted about a problem with "leaks in the upstairs offices." Id. at ¶ 7, Ex. E (p.4). His workers removed damaged, sagging ceiling tiles. Id. at ¶ 6, Ex. D (p.43); Second Gamboa Decl. ¶ 6, Ex. K. Mr. Schinsing described the damage he saw while on the premises between January 6-8: "[w]hat I recall was wet dripping sheet rock, wet enough to put your finger in, like it was very soft. The ceilings were wet and stained from all - water - the carpets were soaked." Gamboa Decl. ¶¶ 3, 4, Ex. H, (p.5), I (p.33). He also said, "I think a tile or two in the hallway was down," and described the tiles as "soaked, distorted and stained." Id. at ¶ 4, Ex. I (p.34). Around this time, Mr. Schinsing determined that one of the causes of the leaks was the improper installation of the HVAC units on the roof. He also determined that the accumulation of pigeon waste such as feathers and droppings in the roof drains was a cause of the leaks.

On January 15, 2003, Plaintiff and Ms. Holland consulted with one another and decided that they would be unable to deal with this level of water incursion with buckets and towels as they had in years past. On January 15th, at the request of Plaintiff, Ms. Holland contacted Restoration Certified – a company that specializes in drying and dehumidifying buildings. Restoration Certified employees came to the premises on January 16th and advised Plaintiff that the building may have sustained damage. Restoration Certified attempted to dry the building with blowers and dehumidifiers. It worked through March 2003 using drying machines and air scrubbers to remove mold contamination, but the mold contamination worsened until it was necessary to seal off the building in June 2003 and begin gutting major portions of the building interior.

On January 21, 2003, at the request of Plaintiff, Ms. Holland contacted AMCO to report a loss incurred as a result of the water.[3] AMCO claim representative Aglae Manzo spoke with Ms. Holland and asked her on what day she noticed the damage. Ms. Holland

---

[2] Mr. Schinsing placed the date of the call as sometime "between the holidays," possibly referring to Christmas and New Years' Day.

[3] Plaintiff's "Premier Businessowners Policy" issued by AMCO covered the time period between July 9, 2002 and July 9, 2003. Manzo Decl. ¶ 4, Ex. A (p.1).

3

said that "it's been coming in for like a month and we've been calling the roofers and they [sic] been going back and forth trying to fix it." Manzo Decl. ¶ 5, Ex. B (p.2). Mrs. Manzo responded that "if you just want to guess the day that's fine I just have to put one down to . . . setup the claim. I can just make notes that we're not exactly sure what day it is." Id. Ms. Holland replied, "[y]eah, how 'bout January ah January 2nd I don't know." Id.

The next day Mrs. Manzo spoke to Plaintiff via telephone, and when asked about the date of the loss[4] he responded, "[w]ell, um ha, the way that's phrased is difficult, it happened when it started raining. And uh the best that we can uh figure is around the-the turn of the year around uh-uh the first or second of 2003 . . . ." Id. ¶ 6, Ex. C (p.2). When asked by Mrs. Manzo if it started earlier than that during the December storms, Plaintiff replied, "since it started it - it has been continuously um leaking and . . . it started at about the time that the rain started . . . which was sometime in the ladder [sic] part of the year." Id. At the end of the interview, Plaintiff later added: "Well ya know, that January 2nd date, ya know, it could also have been December 30; it was right around that time frame. I tried to give you the best estimate that I could as to when . . . ; this was uh a problem that ya know was uh huh different." Id. at 9. Plaintiff told Mrs. Manzo that after consulting with the roofers he'd had working on the problem that the leaks were caused by clogged drains allowing water to puddle and back-up on the roof. Id. at 3-5. When asked what was causing the plug in the drains, Plaintiff replied, "I believe it was uh wild life, pigeons." Id. at 5.

As a further part of AMCO's investigation, Mrs. Manzo spoke with Mr. Schinsing who advised her that there were two leaks. The first was caused by an accumulation of bird waste in the roof drains, which had since been cleared and the leak thereby fixed. The second was due to the improper installation of the HVAC units. Apparently, the way that the units had been installed made it difficult to seal the area where the leak was coming from.[5]

---

[4] Specifically, Plaintiff was asked, "when did this incident happen?"

[5] In May, 2003, workers removed the HVAC units from the rooftop and allegedly discovered a hole in the roof that had been unobservable due to the installation of one of the large and immobile HVAC units. Stephens Decl. ¶ 11. Plaintiff alleges that the installer of the HVAC unit, AC&R, did not cause the hole in the roof (though it is unclear as to why he

4

On February 22, 2003, AMCO sent a letter to Plaintiff denying the claim on the ground that the insurance policy provides no coverage for the identified causes of loss – the accumulation of bird waste and negligence.  In the letter, AMCO also advised Plaintiff of the suit provision of the policy which provides that "[n]o one may bring a legal action against us under this insurance unless . . . the action is brought within one year after the date on which the direct physical loss or damage occurred."  The letter advised that "based on this condition you would have until February 12, 2004[6] in which to bring action against the company."  Plaintiff's request in writing to AMCO on March 18, 2003 to reconsider the denial was met with another denial of the claim on April 2, 2003 in writing and a reminder about the policy's one-year suit provision.

On February 23, 2004, Plaintiff filed this action against AMCO in California state court.[7]  The Complaint contained one cause of action for breach of contract.  AMCO removed the case to this Court based on diversity.  AMCO now moves for summary judgment.

## DISCUSSION

AMCO argues that it is entitled to summary judgment on three theories: (1) Plaintiff's suit is time barred under the policy's one-year suit provision; (2) the causes of Plaintiff's loss – specifically the accumulation of bird waste and the negligent installation and maintenance of the HVAC units – are not covered under the terms of the policy; and (3) even if Plaintiff's suit is not time barred, and even if Plaintiff can show a covered loss, AMCO is entitled to an

---

so concludes), but rather that "AC&R's design and installation of the HVAC units on the roof . . . prevented necessary inspection and maintenance of the area." Opp. at 4:27-5:3.

[6] AMCO calculated the date of February 12, 2004 as follows: the damage was discovered at the latest on January 2, 2003 according to Plaintiff's testimony.  There were 35 days between the date Plaintiff reported the claim to AMCO and the date AMCO denied the claim in writing (plus 6 days for mailing of the denial letter) during which the one-year period was tolled.  Plaintiff therefore had one year plus 41 days from January 2, 2003 to bring suit against AMCO.

[7] On February 25, 2003 Plaintiff also filed suit against AC&R for negligence. Plaintiff eventually prevailed in that suit and collected between $480,000 and $482,000 from AC&R.  Trial testimony from Plaintiff, Ms. Holland, and Mr. Schinsing reiterated the above facts concerning time and nature of the water incursion. Brigham Decl. ¶¶ 5-6, Ex. D-E; Gamboa Decl. ¶¶ 6-7, Ex. D-E.

5

offset of Plaintiff's recovery against AC&R, the sum of which exceeds the policy limits. The Court need not reach the merits of AMCO's second and third arguments because Plaintiff's suit is time-barred under the policy's one-year suit provision.

### The Policy's One-Year Suit Provision

The California Supreme Court has stated:

> The purpose of a statute of limitations is "to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and the right to be free of stale claims in time comes to prevail over the right to prosecute them."

Prudential-LMI Commercial Ins. v. Superior Court, 51 Cal. 3d 674, 684 (1990) (quoting Bollinger v. National Fire Uns. Co., 25 Cal. 2d 399, 406-07 (1944)).

Section E.4.b. of Plaintiff's insurance policy with AMCO ("the Suit Provision") provides: "[n]o one may bring a legal action against us under this insurance unless . . [t]he action is brought within 1 year after the date on which the direct physical loss or damage occurred." The validity of this provision is not in dispute. Likewise, there is no dispute that the one-year period was tolled during the time that AMCO was notified of the loss and the time it formally denied Plaintiff's claim. Both parties agree that the timeliness of Plaintiff's suit requires a determination of when "the direct physical loss or damage occurred." In his Opposition, Plaintiff correctly defines the factual issue in this case:

> If January 2, 2003 is the date by which [Plaintiff] should have been aware that he had a duty to notify [AMCO], his time to file a lawsuit on the insurance contract expired on February 12, 2004. If January 16, 2003, when Restoration Certified . . . told [Plaintiff] . . . that the building could be damaged, is the date on which [Plaintiff] should have been aware of his duty to notify [AMCO], then the last date on which he could have filed suit was February 26, 2004.

Opp. at 7:6-14. Disposition of this issue is governed by California law. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).

For purposes of suit provisions like the one contained in Plaintiff's policy with AMCO,

> [t]he insured's suit on the policy will be deemed timely if it is filed within one year after "inception of the loss," defined as that point in time when appreciable damage occurs and is or should be known to the insured, such that a reasonable insured would be aware that his notification duty under the policy

6

> has been triggered. To take advantage of the benefits of a delayed discovery rule, however, the insured is required to be diligent in the face of discovered facts. The more substantial or unusual the nature of the damage discovered by the insured (e.g., the greater its deviation from what a reasonable person would consider normal wear and tear), the greater the insured's duty to notify his insurer of the loss promptly and diligently.

Prudential, 51 Cal. 3d at 686-87. Both parties agree that the Prudential standard governs the Suit Provision in this case. Resolution therefore turns on a determination of when Plaintiff knew or should have known that his property had suffered "appreciable damage," and that "his notification duty under his insurance policy had been triggered." The standard for determining the date of loss is objective: when "appreciable damage occurs and is or should be known to the insured, such that a reasonable insured would be aware that his notification duty under the policy has been triggered." Id. at 686.

Plaintiff emphasizes that Prudential states that "[d]etermining when appreciable damage occurs such that a reasonable insured would be on notice of a potentially insured loss is a factual matter for the trier of fact." 51 Cal. 3d at 687; see also San Jose Crane & Rigging, Inc. v. Lexington Ins. Co., 227 Cal. App. 3d 1314, 1318 (6th Dist. 1991) (ruling that by granting summary judgment in favor of the insurer, "the [trial] court erred in taking this issue away from the trier of fact"). AMCO counters that summary judgment is appropriate if based upon undisputed material facts such that no reasonable jury could find for Plaintiff on his claim. Prudential, 51 Cal. 3d at 699 ("the date of manifestation and hence the date of inception of the loss will, in many cases, be an issue of fact for the jury to decide. When, however, the evidence supports only one conclusion, summary judgment may be appropriate."). Viewing the facts in the light most favorable to the non-moving party, T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987), and considering other California courts' analyses of analogous facts, the Court concludes, for the reasons that follow, that summary judgment is appropriate on behalf of AMCO because

no reasonable jury could find that Plaintiff did not discover appreciable damage to the building until January 14, 2003.[8]

By his own admission, from mid to late December, 2003 Plaintiff could see water "pouring into the building" "in huge amounts" to the point where it was "coming down the walls" "under the linoleum," and "from the ceiling tiles" which were "saturated," "sagging," and "dripping." He characterized the situation as "a real problem." Plaintiff had hired a roofer as early as December 13th to conduct "emergency roof repairs." When later asked how far the damage was spread at that time, Plaintiff replied "everything was wet up here." When asked when this incident happened, Plaintiff responded that "it ha[d] been continuously . . . leaking [since] about the time that the rain started . . . which was sometime in the ladder [sic] part of the year." He later described the date of the incident as having occurred "around the . . . turn of the year . . . the first or second of 2003," but later added that "it could also have been December 30."

Plaintiff's office manager, Ms. Holland also described the water incursion she observed in December as "sheeting down [the] wall" and causing the carpet to "squish[] when you walked on it." When asked on what day she first noticed the damage, she replied that the water "had been coming in for like a month," and that, though she wasn't sure exactly, stated "how 'bout . . . January 2nd."

Plaintiff's contractor, Mr. Schinsing stated that Plaintiff had contacted him sometime "between the holidays" in December regarding "leaks in the upstairs offices." Describing the damage that he observed while on the premises between January 6-8, he stated that he saw "dripping wet sheet rock" that was "wet enough to put your finger in." Mr. Schinsing also saw "soaked" carpets, "soaked, distorted and stained" ceiling tiles, and even noted that "a tile or two in the hallway was down." An invoice from Mr. Schinsing to Plaintiff dated

---

[8] As Plaintiff points out, this is the cutoff date at which the filing of his Complaint is timely because it constitutes one year (plus 41 days tolled) before he filed his Complaint: "In the case at bar, [Plaintiff] filed his suit as to [AMCO] on February 23, 2004. His suit is timely if he became aware [of appreciable damage] on or after January 14, 2003. If he should have been aware [of appreciable damage prior to that date], his suit is late." Opp. at 14:17-22.

8

January 8, 2003 described work done for Plaintiff to include removal of "damaged ceiling tiles."

Given these characterizations of damage to Plaintiff's building and descriptions of the time period in which they were observed by Plaintiff, his office manager, and his contractor, no reasonable jury could conclude that Plaintiff did not discover appreciable damage to his building until after January 14, 2003. The evidence – consisting of Plaintiff's own testimony and the testimony of his office manager and his own contractor – supports only one conclusion: that a reasonable person having observed what Plaintiff observed would have concluded that the building had suffered "appreciable damage" and that Plaintiff thereby had a duty to notify AMCO.

Plaintiff argues that January 15th (and perhaps as late as January 16th) should be considered the day on which Plaintiff should have been aware that he had a duty to notify AMCO. It was on January 15th that he discussed with Ms. Holland "the wetness in the building," Stephens Decl. ¶ 7, and how "their efforts to dry out the building as they had done in past years were not working." Opp. at 7:15-18. Plaintiff argues that it was at this time that they realized "we couldn't get our building dried in the way we had in the past," Brigham Decl. at ¶ 2, Ex. A, (p.80:15-16), and that "[t]hey decided . . . that they needed outside help." Opp. at 7:18-19; Stephens Decl. ¶ 7. Plaintiff also points out that it was not until January 16th that Restoration Certified advised him that the building "may have sustained damage, and needed to be dried out." Opp. at 3:16-18. In describing what they purportedly learned in dealing with Restoration Certified, Ms. Holland describes it as "overwhelming," "when they started talking about drilling holes in the walls and installing blowers around 24 hours a day . . . and putting in dehumidifiers." Brigham Decl. ¶ 4, Ex. C (pp.52:22-53:1). Ms. Holland stated, "[w]e had leaks in the past and we just cleaned them up and dried them up and kept going. That's what we assumed was going on. And when [Restoration Certified] came to our building, it became apparent that it was not going to be the same this time." Brigham Decl. ¶ 4, Ex. C (p.50:21-25). Apparently, Plaintiff means to suggest that, prior to his discussion with Restoration Certified, he had not appreciated the

9

degree of damage that the building had sustained, and that prior to seeing what would be required to repair the damage, he had not concluded that the damage warranted filing a claim with his insurance company. This argument is unpersuasive.

Implicit in Plaintiff's argument is that it was not prudent, economical, or necessary to file a claim with AMCO because he had always dealt with the leak problem with towels and buckets, and that prior to 2002-03 the amount of any potential damage did not justify making an insurance claim. This argument is analogous to the one rejected in Sullivan v. Allstate Ins. Co., 964 F. Supp. 1407 (C.D. Cal. 1997). In Sullivan, the plaintiffs' home was damaged in the Northridge earthquake of 1994. Id. at 1409. Plaintiffs were home during the quake and "[i]mmediately . . . recognized that their home . . . had suffered significant damage." Id. Despite recognition of the damage to their home and personal property, plaintiffs did not file a claim with their insurance company because they "apparently believed that the cost to repair their damages did not exceed their deductible." Id. at 1410. More than a year after the quake, plaintiffs were advised by a contractor that they had suffered approximately $50,000 in earthquake damage to their home. Id. Plaintiffs thereafter filed a claim. Id. The court ruled the claim time-barred by the one-year suit limitation provision in the insurance policy. Id. at 1412. The court concluded that "the contractual suit limitations provision begin[s] to run on the date of cognizable damage even if the insured subjectively believes that its policy provides no coverage for the damage." Id. at 1413; see also Larkspur Isle Condominium Owners' Assoc., Inc. v. Farmers Ins. Group, 31 Cal. App. 4th 106, 111-12 (1st Dist. 1994) (the "occurrence of 'appreciable' damage does not depend upon discovery that the damage constitutes a covered loss"); cf. Lawrence v. Western Mutual Ins. Co., 204 Cal. App. 3d 565, 573 (2d Dist. 1988) (that the plaintiff is ignorant of his legal remedy or the legal theories underlying his cause of action is irrelevant to the commencement of the suit provision). Under California law, whether a loss is a "covered loss" is determined by application of the coverage clause and exclusions, not whether the claim will result in a payment of benefits. Wells Fargo Bank v. California Guarantee Assn., 38 Cal. App. 4th 936, 948-49 (1st Dist. 1995). The Suit Provision began to run even though Plaintiff apparently believed it was not

worth while to file a claim until he was so advised by Restoration Certified. The relevant inquiry is when a reasonable person would have concluded that the property had suffered appreciable damage; it is not when the insured subjectively believed he should make a claim.

Plaintiff relies on San Jose Crane & Rigging, Inc. v. Lexington Ins. Co., 227 Cal. App. 3d 1314 (6th Dist. 1991). In San Jose Crane, the plaintiff heavy equipment leasing company leased a crane to a sulfur company. Id. at 1316. On December, 14, 1985 a representative from the plaintiff's company noticed that sulfur piles had begun to encroach on the crane's outrigger supports. Id. By December 24, 1985 the representative could see that the crane was buried and that "the cab [of the crane] was crushed." Id. According to the evidence presented, sulfur alone is not corrosive, but sulfur mixed with polluted water creates sulfuric acid which can corrode metal. Id. When the crane was finally unburied on January 3, 1986, the plaintiff representative concluded that the crane "looked fine." Id. at 1317. However, when the crane's manufacturer examined it, he concluded in a report dated January 23, 1986 that the crane was irreparably damaged by corrosion due to sulfuric acid. Id. After the plaintiff's insurance company denied the claim, the plaintiff filed suit on December 31, 1986. Id. The plaintiff argued that it had not appreciated that the crane had been damaged until January 23, 1986, when the manufacturer's report so advised the company; prior to that time the cab "looked fine" and the company was not on notice that corrosion was occurring since pure sulfur does not corrode metal. Id. at 1318. The insurer argued that plaintiffs were damaged no later than December 24, 1985, when the crane was completely buried and the cab was crushed. Id. The court ruled that determination of when the appreciable damage accrued was a question for the trier of fact, and that the trial court "erred in taking this issue away from the fact finder." Id. at 1318.

San Jose Crane is inapposite. The plaintiff's representative in San Jose Crane testified that he observed no damage to the crane, and that it "looked fine." Id. at 1317. As aptly stated in AMCO's moving papers:

> Here, [Plaintiff] and Ms. Holland both testified they observed appreciable damage on December 28, 2002, without the aid of an expert. Moreover, unlike in San Jose Crane, [Plaintiff] did not conclude that what he observed was not damage. Instead, he and Ms. Holland took immediate steps to halt and repair

11

>   the damage by calling Mr. Schinsing to repair the observed damage and by attempting to dry out the damaged areas.

Reply at 7:5-9.  The critical distinction between this case and San Jose Crane is that in San Jose Crane, the plaintiff was wholly unaware of any damage to the crane, id. at 1317, whereas in this case, Plaintiff merely did not appreciate the *magnitude* of the damage that he admits observing.

Several other cases hold that the date upon which "appreciable damage" occurs is not when the insured learns of the magnitude or significance of the damage, but rather it occurs on the date that damage is first cognizable.  See Abari v. State Farm Fire & Casualty Co, 205 Cal. App. 3d 530, 535 (2d Dist. 1988) ("[i]t is the occurrence of some cognizable event rather than knowledge of its legal significance that starts the running of the statute of limitations"); see also Lawrence v. Western Mutual Ins. Co., 204 Cal. App. 3d 565, 573 (2d Dist. 1988) (the suit limitations period begins to run on the date of cognizable damage even if the insured subjectively believes that its policy provides no coverage for the damage).

At oral argument, Plaintiff argued that, in principle, "wetness" is not the same as "damage," and that although he may have observed that the building was wet, this is not necessarily the same thing as recognizing that the building had suffered appreciable damage. Plaintiff described an analogy of spilling a pitcher of water on a carpet: doing so once or only a few times would certainly soak the carpet, but not necessarily appreciably damage it, while doing so many times would at some point eventually cause appreciable damage to the carpet.

Plaintiff's analogy is inapplicable here.  Prior to January 14, 2003, Plaintiff not only saw that the building interior was wet, *he recognized several of the deleterious effects of the wetness*, including "damaged," "sagging," and fallen ceiling tiles that were "distorted" and "stained."  Plaintiff received an invoice dated January 8, 2003 specifically stating that "damaged" ceiling tiles had been removed.  The walls were wet enough to put a finger through.  Even if Plaintiff's observations of damage were limited to a few warped, stained, or fallen ceiling tiles, this was enough to trigger the Suit Provision.  "Once any damage becomes reasonably apparent the time begins to run, even if the full extent of the damage is

unknown." Doheny Park Terrace Homeowners Assn., Inc. v. Truck Ins. Exchange, 132 Cal. App. 4th 1076, 1086 (2d Dist. 2005).

## CONCLUSION

Plaintiff's action is time-barred by the one-year Suit Provision contained in the insurance contract. Suit was not filed within one year (plus the applicable tolling period) of when a reasonable person in Plaintiff's position would have known that the building was appreciably damaged. This Court's determination that Plaintiff's suit is time barred renders moot AMCO's other theories supporting summary judgment. For the forgoing reasons, AMCO's motion for summary judgment is GRANTED.

**IT IS SO ORDERED.**

Dated: Nov. 13, 2006

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE